195 So.2d 910

**BLUE CROSS–BLUE SHIELD OF ALABAMA**

v.

**Frances L. FOWLER.**

**8 Div. 23.**

Court of Appeals of Alabama.

Sept. 27, 1966.

Rehearing Denied Oct. 18, 1966.

Clark E. Johnson, Jr., Albertville, for appellee.

T. J. Carnes, Albertville, Lange, Simpson, Robinson & Somerville, Birmingham, for appellant.

**CATES, Judge.**

This appeal was submitted on oral argument January 18, 1966.

After a layoff, Mrs. Fowler thought that her employer had reinstated her hospital service policy and that the employer was remitting her premiums. She recovered $254.70 for breach of the policy.

Blue Cross defended on the theory that it had never received the premiums.

**I.**

Mrs. Fowler became ill February 6, 1964. She incurred hospital and medical expense of more than $254.70, of which Blue Cross-Blue Shield paid nothing.

She had been issued Blue Cross-Blue Shield's contract for hospital, surgical, medical benefits (effective March 5, 1963), and an extended benefit rider (effective April 5, 1963).

Section VI, "Fees and Terms," of the basic Certificate stated as follows:

"1. FEES—Fees are due and payable to, and must be received by, the Corporation in advance. Payment of fees by a subscriber in a group shall be made in the amount and manner and for the term then in effect for the said group. *The Corporation assumes no responsibility for the failure of any remitting agent to pay fees to it when due.* Payment of fees by the subscriber not in a group shall be made directly to the Corporation at the rates then in effect for a term of a quarter year.

"2. TERM—The subscriber's contract shall continue in force from and after its effective date for the term for which fees have been paid in advance, and from term to term thereafter so long as the applicable fees are paid in advance, unless terminated as herein provided.

"3. GRACE PERIOD—A grace period of thirty (30) days shall be allowed within which to make payment of any fees except the initial fee." (Italics added.)

"Remitting Agent" is defined thus:

" 'Remitting Agent' means any individual, partnership, organization or corporation which, as agent for the subscriber, has agreed with the Corporation to collect and remit the fees payable hereunder."

Section VII, "Termination and Continuance of Coverage," subsection 1, provides:

"Non-Payment of Fees—Failure of the subscriber, or his remitting agent, to pay fees on their due date shall automatically terminate the subscriber's contract as of such due date, and the Corporation shall not be liable for any hospital service received by any member after said due date unless such fees in full are received by the Corporation within the thirty (30) day grace period allowed hereunder."

In May of 1963, Mrs. Fowler temporarily left her employment at the store of Bargain Town USA in Albertville. She applied to Blue Cross-Blue Shield for a direct payment contract under Section VI (1), above quoted.

Blue Cross-Blue Shield sought to show that it sent Mrs. Fowler the following letters:

"DEFENDANT'S EXHIBIT #5

June 12, 1963

"Ms. Frances L. Fowler
410 Bolagers Street
Route 2 Box 10
Albertville, Alabama

"Dear Ms. Fowler:                    Contract # 1045804

"According to our records, you are listed with and paying through the group with Bargain Town U. S. A. As long as you are employed by this group, your dues must be paid as billed on their monthly invoices. We cannot accept your individual payment. For this reason, we must return your Money Order for $5.30 dated June 10, 1963.

"If you are no longer employed by the group, please let us know right away so that we may transfer your contract to a direct-pay basis. We will be glad to hear from you if there is any way in which we may be of help.

> Yours very truly
> Pervy W. Matthews
> Subscriber Accounts Manager

"da
"Enclosure—Money Order for $5.30.

"DEFENDANT'S EXHIBIT #6

June 21, 1963

"Ms. Frances L. Fowler
Albertville, Alabama

"Dear Ms. Fowler:           Contract # BA–4–45   1045804

"Now that your dues will no longer be paid through a group, we will be happy to have you continue coverage on a direct quarterly payment basis. Only groups are permitted to make monthly payments. Direct rates are slightly higher than group rates because of the extra expense involved in handling individual accounts.

"Your $50 Deductible Contract will be continued, however, there will be a slight change in your medical benefits which will now be provided under Rider # 45. This rider provides that, while a bed patient in the hospital, your doctor will be paid $5.00 per visit, after the third day, for ten days, and up to 57 additional visits paid for at $3.00 each day. Your dues are now paid to July 5, 1963. Attached is a statement of the amount needed to pay to your next quarterly billing date of October 5, 1963. In the future, quarterly statements will always be mailed to you about ten days before payments are due.

"We are returning your Money Order for $5.30 dated June 10, 1963, and ask that you make payment as billed on the enclosed statement. New identification cards will be sent to you as soon as this payment is received. If we may be of further help, please do not hesitate to let us know.

> Yours very truly
> Pervy W. Matthews
> Subscriber Accounts Manager

"da
"Enclosures"

Mrs. Fowler testified on direct (R. 31–32) that she wrote for an individual policy and after some correspondence she continued paying her premium (R. 37). No receipts came in evidence.

After a two-months' layoff, Bargain Town USA called her back to work. She testified that she wrote Blue Cross-Blue Shield at that time. She further testified that all through the Fall of 1963 and during January and February the monthly premium was deducted from her pay.

Blue Cross-Blue Shield called as a witness Mrs. Marie Lowery who was assistant officer manager of the Birmingham office of Bargain Town USA. She had supervision over the bookkeeping of the Albertville store. She was custodian of payrolls including those from outlying stores prepared by bookkeepers at those establishments. Her testimony was partly favorable to Mrs. Fowler, the plaintiff:

"Q Now, can you determine from that payroll record for 1963 what payroll periods the deductions were made from Mrs. Fowler's wages for Blue Cross fees?

"A On November 4, 1963 she was deducted $5.30 for Blue Cross Insurance, on November 25th, $5.30 also, on December 30, 1963, $5.30 also.

"Q So, according to those records, no deductions were made for Blue Cross from the time of employment on August 1st through the time November 9th?

"A November 4th.

"Q Now, are these deductions that are made, what amounts are those?

"A $5.30 per month.

"Q Now, that is for each month's premium?

"A Yes.

"Q And a deduction is made once a month for those?

"A Yes.

"Q Now, I hand you Defendant's Exhibit # 10, which is the 1964 payroll records for Frances Fowler with Bargain Town,—would you tell me what dates premiums were deducted for Blue Cross?

"A January 27, 1964, $5.30, February 24, 1964, $5.30, March 23, 1964, $5.30."

But Bargain Town USA did not cross check its hospital insurance deductions each month against the "premium invoice" which it used in remitting to Blue Cross-Blue Shield. According to Mrs. Lowery's testimony, Mrs. Fowler's name got left off this form from her return to work in August, 1963:

"Q When was the last time you paid any dues for Mrs. Fowler to Blue Cross?

"A The payment was sent to Blue Cross-Blue Shield Office on June 14, 1963; she was included on our June invoice.

"Q On your June invoice which would cover what period?

"A The month of June.

"Q That was the last time that any payment was made?

"A Yes, through our office.

*    *    *    *    *    *

"Q What did you do after you found out that Bargain Town had been making deductions?

"A I issued Mrs. Fowler a check for the payments that had been deducted.

"Q You issued her a check?

"A Yes.

"Q And what amount did this check cover?

"A $31.80."

## II.

We do not have in this record the form of authorization for Mrs. Fowler's payroll deductions. We assume that the original insurance was effected by prepayment of

the premium and not by Mrs. Fowler's making any promissory assignment of future wages. Hence, we forego any consideration of Code 1940, T. 39, § 201.[1] Stephens v. United States Steel Corp., 5 Cir., 212 F.2d 705; Continental Cas. Co. v. Vines, 201 Ala. 486, 78 So. 392.

In his oral charge to the jury the trial judge adopted the theory that the common law—contrary to Section VI of Blue Cross-Blue Shield's contract—made Bargain Town USA the agent of Blue Cross-Blue Shield.

Defendant excepted to (and argues for error in) the giving of the following direction of law to the jury:

> "Now, gentlemen, it is the law of Alabama that the payment by an employee of his or her monthly premiums through a deduction from his or her monthly salary by his employer, who by prearrangement is to retain the same and make payment of monthly premium on the group policy to an insurance company, that that is payment to the insurance company insofar as such employee is concerned, whether the employer makes remittance of that amount or not. * * *"

Both parties agree that the root of this instruction is from the opinion in All States Life Ins. Co. v. Tillman, 226 Ala. 245, 146 So. 393.

The appellant contends, however, that Blue Cross-Blue Shield, through the definition of "Remitting Agent" and the italicized language in Section VI(1), both above quoted, has contracted itself outside the *Tillman* rule of agency.

Moreover, in brief, Blue Cross-Blue Shield points out that the instant contract was with the subscriber directly. In *Tillman* the contract was between employer and the insurance company with the employee being in a vicarious relationship.

If, under Hill v. Metropolitan Life Ins. Co., 266 Ala. 285, 96 So.2d 185, the employer is the "owner" of a group policy, then it seems clear that under the Blue Cross-Blue Shield policy in this record the employee is the "owner." In Blue Cross-Blue Shield v. Jackson, 42 Ala.App. 594, 172 So.2d 804, this court (2–1) treated the policy there cancelled as though it were a group one.

This treatment was used in analyzing the legal effect of Blue Cross-Blue Shield's notifying the *individual* employee directly in addition to the employer remitting agent. See Stipulation, 42 Ala.App. at 598, 172 So.2d 804.

However, the penultimate paragraph of the *Jackson* opinion is careful to limit the scope of construction to a double coverage option. Thus, we noticed the possibility in negotiating for the replacement policy to have the subsequent coverage take over where Blue Cross-Blue Shield left off.

Nothing expressed therein derogates from treating the *Tillman* case as not applicable here. See Kiley v. Pacific Mutual Life Ins. Co., 237 Ala. 253, 186 So. 559 (hn. 9).

In Rodgers v. Commercial Cas. Co., 237 Ala. 301, 186 So. 684, Gardner, J., remarked:

> "* * * Our cases recognize the same right of insurance companies (statutory provisions to one side) as individuals to limit their liability and to impose such conditions as they wish upon their obligations, not inconsistent with public policy, and that the courts are without right to add to or subtract therefrom. The companies have a right to write contracts with narrow coverage, and a small premium fixed on careful calculation of the hazard assumed. And we have said, speaking of such contracts, that 'they should be enforced, not a new or enlarged contract

---

[1] Code 1940, T. 39, § 201: "All assignments hereafter made by any person of salaries or wages, to be earned in the future, shall be absolutely void. The provisions of this section shall also apply to orders given by employees covering the whole or part of future wages."

made for the parties.' Loveman, Joseph & Loeb v. New Amsterdam Cas. Co., 233 Ala. 518, 173 So. 7, 10.''

■ The same freedom to express the terms on which it wants to hold or not hold remitting employers as its agents was open to Blue Cross-Blue Shield. The fact that Bargain Town USA did not send the money to Blue Cross-Blue Shield, standing alone, certainly affords no reasonable implication of Bargain Town USA's agency for Blue Cross.

No other relationship was shown between Bargain Town USA and Blue Cross-Blue Shield beyond sending "invoices" (i. e., lists of employees) and a check each month for the total of the wage deductions.

Appellee argues that in *Tillman* there was a single master policy. This instrument governs if an employee's certificate uses discrepant language.

The use of multiple "identical individual policies," appellee contends, has set up a web which is the equivalent of one master policy. Analogy might be thus made to a building scheme created by restrictive covenants in disparate deeds to the various lots from a common original grantor. Scheuer v. Britt, 217 Ala. 196, 115 So. 237. Strictly, the instant arrangement is not group insurance but rather a group of employees who remitted premiums collectively for *themselves*.

Here, however, it is not shown that each enrolling employee of Bargain Town USA got an "identical" policy, nor that the express exclusion of Bargain Town USA as an agent for Blue Cross-Blue Shield was modified or waived by the latter's adopting any action of Bargain Town USA as its action.

■ For the giving of the quoted language in its oral charge, the trial court committed error. This language was contrary to the express contract on which Mrs.

Fowler sought recovery. Therefore, it was prejudicial to Blue Cross-Blue Shield.

Reversed and remanded.

JOHNSON, Judge (dissenting).

I believe that there is sufficient evidence in this case to sustain the verdict of the jury for the appellee in the circuit court and that such court committed no reversible error in its charge to the trial jury, or otherwise. The judgment for the appellee should not be disturbed and this cause should be affirmed. I, therefore, must respectfully dissent from the majority opinion.

On Rehearing

CATES, Judge.

Appellee in brief to support his application for rehearing states:

"We cannot, of course, close our eyes to the fact that this Court may over-rule our application for a re-hearing. We must therefore give some thought to a fair review of the case by the Supreme Court. It is established law of this state that the Supreme Court will not review the Court of Appeals with reference to findings of fact but will only review the Court of Appeals with reference to matters or conclusions of law.

"In its opinion the Court of Appeals denies there is a jury question concerning certain finds and conclusions of fact. We feel there is evidence contrary to the findings and conclusions of the Court, which was overlooked by a majority of the Court in reaching its conclusions.

"The first statement we refer to is on Page 8 of the Court's opinion, to-wit:

" 'Strictly, the instant arrangement is not group insurance but rather a group of employees who remitted premiums collectively for themselves.'

"If the Court desires to continue this finding of fact, or conclusion, we respect-

fully request the Court to recite in its opinion the testimony found on Page 78 of the Transcript, in which the Vice-President of the appellant made the flat statement that there was a group insurance plan with Bargain Town and its employees.

"Also, Exhibit I on Page 98 of the Transcript shows the existence of a group plan.

"This is in addition, of course, to the statement in the certificate with reference to a group plan, as well as Exhibits 5 and 6 mentioned in the Court's opinion. There is further no evidence in the Transcript that the employees remitted the premiums collectively for themselves or that the employees had any control or participated in the collection and remittance of insurance premiums. Such fi.ding of fact is untenable and should be abandoned by the Court, and *certainly there is evidence* in the record from which a contrary conclusion could be reached. Surely a jury question is at least created with reference to a group insurance plan.

"With reference to the statement that the employees remitted the premiums collectively for themselves, we believe the Court should set out any evidence which would justify such conclusion or statement, and certainly would have to further conclude that there was no evidence to the contrary. The evidence in the case clearly and definitely shows that the premiums were paid by way of payroll deductions. The payroll deductions were made because of the notification received by employer from Blue-Cross. Blue-Cross made up the invoice which was paid by the employer. It appears from the evidence in the case that Blue-Cross was both responsible for the invoice which omitted appellee's name and contract and for the payroll deductions which were originated and initiated, under the procedure followed, by Blue-Cross. Also, appellee testified (See Page 32 of Tran-

script) that she made application to be re-admitted.

"We do not find in the Court's opinion where the Court specifically states that Bargain Town, USA was the agent of the appellee and her fellow employees. This is clearly implied and the Court in the final analysis gives effect to this theory or implied finding. The evidence all clearly shows such was not the case. (See Transcript Page 92) There is no evidence that we could find in the Transcript that appellee or her fellow employees gave or had any control or direction with reference to collecting or remitting of insurance premiums. We think the Court's opinion should be clear on this or else should recite evidence to show the opposite, and any contrary evidence should also be cited. At this point in the proceedings, it would only be necessary to show that a jury question had been presented.

"The Court's opinion quoted certain testimony of Marie Lowery, witness for appellant. From the testimony quoted, it could be inferred that the premium deductions had been returned to the appellee. The record definitely shows that such payment was refused and returned to her employer by the appellee and that the witness had possession of the check. (See Transcript Page 91). This inference should be corrected.

"We are following this brief by an additional motion and we ask that the foregoing also be considered by the Court in support of such motion, and that the matters set out in such motion be considered in support of the application for re-hearing.

"In the event the Court does over-rule our application for re-hearing, we would appreciate the Court modifying and extending its opinion to more clearly present the facts in regard to the matters mentioned above and specifically referred to in the motion which follows this brief."

**580**

The appended motion reads:

"If the Court of Appeals fails to grant the foregoing motion and application for re-hearing, in such, event, we move and apply to the Court to include in its opinion certain facts and circumstances in this case, which are not recited or stated in the Court's opinion, to-wit:

"1. The testimony of Marie Lowery with reference to control over her activities by the appellee found on Page 92 of the Transcript, and consisting of the first five questions and answers of such witness on cross-examination. (showing the dependency of the appellee upon her employer and the appellant with reference to payment and collection of premiums.

"2. The cross-examination of witness, Jack Bruce, Vice-President of appellant, shown on Page 78 of the transcript as follows:

"Q: 'That was to cover the group insurance plan you had with Bargain Town and its employees?'

"A: 'Yes, sir.'

"Q: 'All right, you did have a group insurance plan with Bargain Town and its employees?'

"A: 'Yes, sir.'

"3. Also, defendant's Exhibit I found on Page 98 of the Transcript.

"4. The Court should further describe the procedure for collection and remittance of premiums which, under the testimony of the Vice-President of appellant and Marie Lowery, was that the employee would make an application to be included in the group plan and that upon approval of the application by appellant, who then notified Bargain Town of such approval, premiums were then deducted. That

Blue-Cross submitted to Bargain Town periodically an invoice setting out and describing the premiums which it deemed to be due. (This procedure reveals definitely that appellee and her fellow employees were entirely dependent upon Bargain Town and Blue-Cross in collection and remittance of premiums and had not control over the situation.)

"5. The testimony of appellee (Mrs. Fowler) that upon her re-employment with Bargain Town she applied to be readmitted to the group and was accepted, and that deductions thereafter were made from her salary, (See Transcript Pages 32 and 33) and also that the record shows appellee and her fellow employees never received any receipt from appellant, and had no way of ascertaining or knowing if their premiums were being received."

Exhibit 1 (R. 98) is a letter written to Mrs. Fowler shortly after she went to work for Bargain Town in Albertville. It reads:

"January 22, 1963

"Mrs. Frances Fowler
Route 2 Box 10
Albertville, Alabama

"Dear Mrs. Fowler:

"We will be happy to have your Blue Cross-Blue Shield membership transferred to the Alabama Plan, with dues to be paid through the Bargain Town group. Please complete the enclosed application and statement of transfer and return to this office within the next ten days. We will then obtain your status from your former Plan, and your name will be included on your group's next possible invoice.

"Your dues will be $12.30 per month for a family contract, or $5.25 for an individual female contract.

"A self-addressed envelope is enclosed for your convenience in replying. Also,

please find enclosed a descriptive folder on the $25 Deductible contract under which you will be covered in our Plan.

"Sincerely yours,

"/s/ Pervy W. Matthews
"Pervy W. Matthews
"Registration Manager"

As to "4." in the above quoted motion, we believe that the "invoice" system used by Blue Cross originates with a list set up by the remitting agent (here the employer) based on applications of the group. The next month Blue Cross sends the remitting agent the same list.

If new employees have been hired who want Blue Cross, the remitting agent adds their names and adjusts the gross amount of remittance for premiums. Changes by way of deletion or change of marital status are covered by the remitting agent's notations of adjustment.

Defendant's Exhibit 8 (R. 52–76) is comprised of Blue Cross's invoices to the Bargain Town group for the months April through December, 1963.

We think that from the *Tillman* case, supra, as to a group policy two points of difference appear here.

■ *First,* unless otherwise stated, a group policy is between insurer and employer. It is sometimes furnished without premium cost to the employee. In other cases premium costs are shared.

Here a low rate seems to be given by Blue Cross because the bookkeeping, in the minute details, is done by the remitting agent. The major benefit seems to go to the employee.

■ *Second,* a group policy ordinarily can be cancelled without notice to the employee unless a claim has accrued. Hill v. Metropolitan Life Ins. Co., 266 Ala. 285, 96

So.2d 185. On the other hand, in a Blue Cross policy of the type in evidence here cancellation must be sent to the employee. The employee is in privity. Notice to the remitting agent is only for convenience in having an agreed address for such notices.

■ We are aware of no public policy either emanating from our Legislature or in the decisional law that demands that we ignore the express written wording of the Blue Cross policy to the effect that the employer in remitting is the employee's agent.

Let us imagine that Bargain Town had become bankrupt. Would Blue Cross be a creditor or would the employees claim their wage preferences for the withheld premium amounts? Legislation could require remitting agents to be bonded to remit faithfully: none is cited to us.

Blue Cross wrote the contract, we do not doubt. That, in a case of ambiguity, is resolved under a familiar rule of contract construction.

We do not think the language here brought to bear admits of ambiguity. Nor do we read appellee as contending so.

We consider that appellee believes that the *Tillman* case sets up a rule of prohibition against the language used. However, we think that in the absence of a prior enactment regulating what could or could not appear in a Blue Cross policy, the courts cannot ignore the plain words of the contract. MacMahon v. Baumhauer, 234 Ala. 482, 175 So. 299.

The *Tillman* case we take as a rule of construction where the contract was silent as to the role of the employer. We cannot legislate and a fortiori could not do so ex post facto.

Application overruled.

JOHNSON, J., dissents.